Logan Smith (*will comply with LR IA 11-2 within 10 days*)
lsmith@mcnamarallp.com
Edward Chang (NV 11783)
echang@mcnamarallp.com*)*
MCNAMARA SMITH LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Tel.:   619-269-0400
Fax:   619-269-0401

Michael F. Lynch (NV 8555)
Michael@LynchLawPractice.com
LYNCH LAW PRACTICE, PLLC
3613 S. Eastern Ave.
Las Vegas, Nevada 89169
Tel.:   702-684-6000
Fax:   702-543-3279

*Attorneys for Court-Appointed Monitor*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Monitor for AMG Capital Management, LLC, BA Services LLC, Black Creek Capital Corporation, Broadmoor Capital Partners, LLC, Park 269, LLC, C5 Capital LLC, DF Services Corp., DFTW Consolidated [UC] LLC, Impact BP LLC, Level 5 Apparel LLC, Level 5 Capital Partners LLC, Level 5 Eyewear LLC, Level 5 Motorsports, LLC, Level 5 Scientific LLC, NM Service Corp. (f/k/a/ National Money Service), PSB Services LLC, Real Estate Capital LLC (f/k/a/ Rehab Capital I, LLC), Sentient Technologies, ST Capital LLC, Westfund LLC, Eclipse Renewables Holdings LLC, Scott Tucker Declaration of Trust, dated February 20, 2015, West Race Cars, LLC, and Level 5 Management LLC and their successors, assigns, affiliates, and subsidiaries, | Case No. |
| | **MONITOR'S COMPLAINT FOR: (1) FRAUDULENT TRANSFER; (2) QUASI-CONTRACT CLAIM FOR RESTITUTION BASED ON UNJUST ENRICHMENT; AND (3) ACCOUNTING** |
| Plaintiff, | **JURY TRIAL DEMAND** |
| v. | |
| GARY PATTEN, an individual; PANO ADVISORS, INC., a Nevada corporation; DOES I-X; and ROE CORPORATIONS I-X, | |
| Defendants. | |

Plaintiff, Thomas W. McNamara ("Plaintiff" or "Monitor"), in his capacity as court-appointed Monitor, hereby brings the following Complaint against Gary Patten ("Patten") and Pano Advisors, Inc. ("Pano Advisors," and collectively, "Defendants"), and alleges the following:

**PARTIES**

1.     Plaintiff is the Court-appointed Monitor in the related case *Federal Trade Commission v. AMG Services, Inc., et al.*, 2:12-cv-00536-GMN (VCF) (D. Nev.) ("*FTC v. AMG Services*"), appointed by the Order Appointing Monitor and Freezing Assets entered November 30, 2016 (ECF No. 1099) (the "Monitor Order").  A true and correct copy of the Monitor Order issued in *FTC v. AMG Services* is attached as Exhibit A hereto and incorporated by reference.  The Monitor Order directs the Monitor, *inter alia*, to preserve the value of the assets in the Monitorship Estate and authorizes the Monitor, *inter alia*, to institute actions to preserve or recover those assets. *See id.* at 12.

2.     The Monitor Order defines the Monitorship Estate to include, *inter alia*, all assets of Scott Tucker (the individual defendant in *FTC v. AMG Services*) ("Tucker") and all assets of the "Monitor Entities" which are identified to include: the corporate defendants named in *FTC v. AMG Services* (AMG Capital Management, LLC, Level 5 Motorsports, LLC, Black Creek Capital Corporation, and Broadmoor Capital Partners, LLC); the corporate relief defendant named in *FTC v. AMG Services* (Park 269, LLC); and multiple Tucker related and controlled entities: BA Services LLC, C5 Capital LLC, DF Services Corp., DFTW Consolidated [UC] LLC, Impact BP LLC, Level 5 Apparel LLC, Level 5 Capital Partners LLC, Level 5 Eyewear LLC, Level 5 Scientific LLC, NM Service Corp. (f/k/a/ National Money Service), PSB Services LLC, Real Estate Capital LLC (f/k/a/ Rehab Capital I, LLC), Sentient Technologies, ST Capital LLC, Westfund LLC, Eclipse Renewables Holdings LLC, Scott Tucker Declaration of Trust, dated February 20, 2015, West Race Cars, LLC, and Level 5 Management LLC, and their successors, assigns, affiliates, and subsidiaries.

3.     Defendant Gary Patten is an individual who worked for Tucker and various Tucker entities that now are part of the Monitorship Estate.  During the relevant time period, Patten lived in Kansas, California, and Nevada.

1

4.       Defendant Pano Advisors, Inc. is a Nevada corporation with its principal place of business during the relevant time period located at 7104 W. 123rd Terrace, #407, Overland Park, Kansas 66209.  Patten is the President and sole officer of Pano Advisors.

5.       The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants herein designated as DOE I through DOE X and ROE CORPORATION I through ROE CORPORATION X are unknown to Plaintiff, who therefore sue said Defendants by such fictitious names.  Plaintiff believes and thereon alleges that other defendants named as DOE and ROE CORPORATION defendants are responsible in some manner for the acts complained of herein and described more fully infra.  Plaintiff will seek to amend this Complaint to allege their true names and capacities as they are ascertained in this action.

6.       The Monitor is informed and believes, and on that basis alleges, that Defendants acted at all times mentioned herein as the actual and/or ostensible agents or representatives of each other and, in doing the activities alleged herein, acted within the scope of their authority as agents and representatives, and with the permission and consent of each other.  In undertaking the acts alleged herein, each Defendant was acting in concert with the other Defendants, and as each other's alter egos.

### JURISDICTION AND VENUE

7.       This Court has jurisdiction over this matter under 28 U.S.C. § 754, 28 U.S.C. § 1345, and 28 U.S.C. § 1367(a), and the doctrines of supplemental and ancillary jurisdiction.  *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004) ("the receiver's complaint was brought to accomplish the objectives of the Receivership Order and was thus ancillary to the court's exclusive jurisdiction over the receivership estate").

8.       Venue in the District of Nevada is proper pursuant to 28 U.S.C. § 1391, because the Court retained jurisdiction of this matter for all purposes and appointed the Monitor in the District of Nevada on November 30, 2016, and because this proceeding is supplemental to *FTC v. AMG Services.  See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th Cir. 1981) ("[W]here jurisdiction is ancillary, the post-jurisdictional consideration of venue is ancillary as well.")

9.      The Court may exercise personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1692 because the funds sought to be recovered are assets of the Monitorship Estate under the Court's Orders issued in *FTC v. AMG Services*.

### <u>OVERVIEW</u>

10.     This is an action, *inter alia*, to clawback as fraudulent transfers more than $10 million in Monitorship Estate assets transferred to Defendants that were proceeds of the illegal payday loan businesses operated by Tucker.

11.     Beginning in 1997 and for more than a decade, Tucker operated a large scale, highly profitable and illegal payday loan business based in Overland Park, Kansas.  This business combined unlawful practices (exorbitant interest rates and deceptive disclosures on the true cost of the loan) with a phony structure (a sham relationship with a bank to skirt state usury laws and sham relationships with Native American tribes to skirt regulation all together by invoking the tribes' sovereign immunity).

12.     After entering a judgment of liability and a monetary award of more than $1 billion against Tucker and his controlled entities, the Court in *FTC v. AMG Services* entered the Monitor Order as a post-judgment vehicle to freeze and preserve assets while Tucker appealed that judgment.

13.     As authorized by the Monitor Order, the Monitor brings this action to recover the Monitorship Estate assets disbursed to Defendants.  Over an extended period, spanning from 2009 through at least 2014, Patten and his company Pano Advisors enriched themselves through their relationship with Tucker and the Monitor Entities and related tribal entities over which Tucker exercised complete control and domination.

14.     On information and belief, Patten became a trusted and high-ranking member of Tucker's tight inner circle – with an office located next door to Tucker in his Overland Park, Kansas office complex – and referred to himself under varying titles – consultant, employee, and even BA Services LLC's "CFO".  Patten possessed intimate knowledge of Tucker's business practices and understood Tucker's control of and domination over the tribal entities and their bank accounts and operations.  Patten not only knew about the FTC's allegations, but also had an

3

understanding of the inner workings of Tucker's Overland Park operations, including its financial books and records, and the ability to investigate and verify the FTC's allegations as true. Thus, Defendants knew or should have known that monies received from Tucker's operations were not rightfully theirs. Rather, those monies belonged to the Monitor Entities and were the proceeds of an ongoing fraud operating out of Overland Park, Kansas and directed by Tucker.

15.     The millions of dollars in transfers paid to Patten came in a variety of forms, including a regular monthly salary and lump-sum "consulting" payments totaling as much as $1 million. The bulk of payments to Patten and his company Pano Advisors were the millions of dollars he received through payment in so-called monthly "incentive" fees, which resulted in exorbitant sums being paid to Defendants long after the FTC brought its lawsuit in April 2012 and Defendants were well aware of mounting red flags reflecting an illegal business.

### *FTC v. AMG Services*

16.     The Complaint in *FTC v. AMG Services*, filed April 2, 2012, alleged that Tucker and his related entities operated a massive common enterprise engaged in illegal and deceptive practices by, *inter alia*, offering consumers payday loans via disclosures that misled them about the true cost of the loan, requiring that consumers pre-authorize electronic fund transfers, and engaging in unlawful debt collection practices.

17.     The Complaint alleged violations of Section 5(a) of the FTC Act which prohibits deceptive acts or practices in commerce, the Truth in Lending Act which requires full and accurate disclosure of the true costs of the loan, and the Electronic Funds Transfer Act which prohibits conditioning the extension of credit on a consumers' preauthorization of electronic funds transfers.

18.     In addition to Tucker, the named defendants in *FTC v. AMG Services* included Tucker's loan servicing companies (AMG Services, Inc. (which had "merged" with CLK Management LLC), NM Service Corp, and Universal Management Services, Inc.), the three Indian tribal entities through which Tucker operated and controlled (Red Cedar Services, Inc., SFS, Inc. and MNE Services, Inc.), and the four Tucker corporate lending companies (AMG Capital, Level 5 Motorsports LLC, Black Creek Capital Corporation, and Broadmoor Capital Partners, LLC).

///

19.     The Complaint also alleged that Tucker centrally operated and controlled these businesses from Kansas as a common enterprise which he directed and controlled and had signatory authority on every corporate account.

20.     The Court bifurcated the proceedings into two phases.  During Phase I, the Court adjudicated the merits of the FTC's claims for violations of the FTC Act, TILA, and EFTA.  During Phase II, the Court adjudicated remaining issues, including individual liability, affirmative defenses, and remedies.

21.     As to Phase I, on May 28, 2014, the Court granted summary judgment in favor of the FTC and against Tucker and other defendants on Count I (Deceptive Acts and Practices in violation of the FTC Act) and Count III (Violations of TILA and Regulation Z).  *See FTC v. AMG Services*, ECF No. 584.

22.     In 2015, the Court entered permanent injunctions and monetary judgments against the three tribal lending entities that were fronts for Tucker's operations – Order of January 23, 2015 against MNE Services, Inc. for $21 million (ECF No. 727); Orders of November 25, 2015 against Red Cedar and SFS for $2.2 million each (ECF Nos. 888-89).

23.     As to Phase II, on September 30, 2016, the FTC's motion for summary judgment against Tucker, Level 5 Motorsports, LLC, Black Creek Capital Corporation ("Black Creek Capital"), and AMG Capital Management, LLC, among others, was granted.  A true and correct copy of the Order Granting Summary Judgment issued in *FTC v. AMG Services* is attached as Exhibit B hereto and incorporated by reference.  The Court entered a judgment in the amount of $1,301,897,652 as equitable monetary relief.  *Id.* at 29.

24.     The Court found that Tucker structured the tribal lending entities based in Overland Park, Kansas to be completely dependent on the Tucker loan servicing companies, also based in Overland Park, Kansas, and that Tucker and his related entities operated as a common enterprise and were thus jointly and severally liable.  *Id.* at 12, 18.

**The Monitor**

25.     On November 30, 2016, the Court entered the Monitor Order to facilitate post-judgment collection and enforcement of the previously entered asset freezes.  *See FTC v. AMG*

*Services*, ECF No. 960 and 1030.  The Monitor Order includes a similar asset freeze provision. *Compare FTC v. AMG Services*, ECF No. 960 at 14 with *FTC v. AMG Services*, ECF No. 1099 at 6.

26.     The Monitor Order granted the Monitor wide powers to preserve the value of the Monitorship Estate assets under the Asset Freeze Order, including but not limited to obtaining or creating an accounting of the Assets and preventing the transfer, withdrawal or misapplication of the Assets.  *See* Exhibit A at 12.

27.     The Monitor Order further authorized the Monitor to conduct such investigation and discovery as may be necessary to locate and account for additional assets and to "[i]nstitute, compromise, adjust, appear in, intervene in, or become a party to such actions or proceedings in state, federal or foreign courts that the Monitor deems necessary and advisable to preserve or recover the Monitorship Estate or to carry out the Monitor's mandate under this order."  *See* Exhibit A at 13-15.

28.     BA Services LLC ("BA Services"), the primary source of the transfers to Defendants, is identified as one of the Monitor Entities subject to the Asset Freeze Order.  *See* Exhibit A at 3; *see also FTC v. AMG Services*, ECF No. 1030 ("It is further ordered that the following twenty-two entities are within the scope of the Court's Asset Freeze Order (ECF No. 960): . . . BA Services LLC").

29.     Until the appointment of the Monitor, Tucker had exercised full, complete, and exclusive control of, and domination over, the common enterprise, including, but not limited to, the Monitor Entities and all related entities, and all assets of the Monitorship Estate.  Certain assets of Tucker and/or the Monitor Entities were nominally held by tribal entities also under Tucker's control through sham relationships.

30.     Prior to the Monitor's appointment, Tucker took no actions to prevent or vindicate the harms caused to the Monitorship Estate by him, his common enterprise, and the fraudulent transfers to Defendants, among others.  While Tucker remained in control of the common enterprise and its assets, the fraudulent transfers to Defendants were concealed and only became

///

discoverable and legally actionable after the Monitor had been appointed and empowered to bring suit to recover such assets.

31.     During the course of his investigation, the Monitor identified transfers of Monitorship Estate assets to Defendants, which assets rightfully belong to the Monitorship Estate. The Monitor brings this action to void these fraudulent transfers and to claw back from these defendants the more than $10 million in transfers of Monitorship Estate assets, plus interest, which BA Services and other related entities made at the control and direction of Tucker.

**Tucker's Criminal Conviction**

32.     In February of 2016, Tucker, along with his attorney, Timothy Muir ("Muir"), was indicted on fourteen felony counts in the Southern District of New York in connection with the payday lending enterprise operating out of Overland Park, Kansas.

33.     The Superseding Indictment, filed on November 30, 2016, included allegations that the loan disclosures were materially false and misleading in setting forth the overall cost of the loan to the consumer; the loans were made at usurious rates; and Tucker sought to shield these illegal operations through sham transactions that made it appear that the lenders were Native American tribal entities immune from state usury laws.

34.     On October 13, 2017, Tucker and Muir were convicted on all fourteen counts charged in the Superseding Indictment.

**Tucker's Fraudulent Payday Lending Activities**

35.     From 1997 through at least 2013, Tucker founded, controlled, and dominated a web of illegal payday lending companies based in Kansas.  For the vast majority of the time, Tucker's enterprise was located at the same address, 10895 Lowell Avenue, Overland Park, Kansas.

36.     Tucker's companies included the three loan servicing companies, NMS, CLK Management LLC ("CLK"), and Universal Management Services, Inc. ("UMS") (collectively the "Loan Servicing Companies").  *See* Exhibit B at 3.  UMS is a subsidiary of NMS.

37.     CLK was formed by Tucker as a Kansas entity to provide an operational umbrella for all of his portfolios.  As described by Tucker's counsel in a 2009 mediation brief, "Since Tucker was in Kansas operating and managing the NMS' portfolio inside the County Bank Program, as

well as the Nominee Portfolio Companies and their portfolios which were outside of the County Bank Program, Tucker decided to form a single Kansas entity that would provide the operational umbrella for all of the portfolios."  This entity was CLK, which operated under Tucker's direction and control from the same Overland Park address.  CLK performed a variety of tasks, including acquiring equipment for the benefit of the other portfolios, hiring employees, renting space, contracting with outside vendors, and paying for everything necessary to operate the portfolios.

38.    CLK later "merged" with AMG Services, Inc. ("AMG Services"), another tribal entity, in an effort to bring its operations within the tribe's sovereign immunity.  This "merger" was accomplished by a scheme orchestrated by Tucker, with the assistance of counsel who filed a sham lawsuit in Kansas court to confirm the "merger".  *See U.S. v. Scott Tucker*, 254 F. Supp. 620, 622-23 (S.D.N.Y. 2017) (applying crime-fraud exception to documents relating to Kansas lawsuit, because of government's evidence showing probable cause that lawsuit was a "'sham' lawsuit orchestrated for the purpose of invoking tribal immunity as to defendants' allegedly usurious lending practices").

39.    Tucker managed, owned, operated, controlled, and dominated the tribal lenders, the service companies, and the corporate lenders and the other Monitor Entities from his base of operations in Overland Park, Kansas, where at one point in excess of 600 employees worked.

*The Rent-a-Bank Model*

40.    In order to skirt usury laws in effect in most states, beginning in or about 1997, Tucker invoked an illegal "rent-a-bank model" by which they "exported" interest rates from County Bank of Rehoboth, Delaware ("County Bank"), which was incorporated in a state with no usury laws.  This provided the appearance of legitimacy with County Bank as the front for the payday lender, while the actual lender controlled by Tucker would claim only to "service" the loan.

41.    Tucker knew that this set-up was a sham in violation of the law and knew that they, not the bank, controlled the loan approval process and funded the loans.  The bank was paid to act as a front for the illegal enterprise.

///

42.     In 2003, the States of Kansas, Colorado, and California sued Tucker and certain of his payday lending operations for violation of anti-usury laws.

*The Rent-a-Tribe Model*

43.     Beginning in 2003, Tucker embraced a new model to funnel activities through corporate entities nominally owned by various Native American tribes and invoke the sovereign immunity of the tribes to avoid legal restrictions.  This model was based on the sham that the tribes owned and controlled the entities when, in fact, Tucker did so.

44.     To implement this model, between 2003 and 2008, Tucker's loan servicing companies entered into agreements with several tribes to become "authorized lenders" for his companies.  *See* Exhibit B at 3; *see also FTC v. AMG Services*, ECF Nos. 908-02, 908-014, 908-015 (Agreements).  The tribes, in turn, formed new corporate entities to facilitate these payday loans, including MNE Services, Inc., Red Cedar Services, Inc., and SFS, Inc.  *See* Exhibit B at 3.

45.     As part of these efforts, Tucker's companies assigned to the tribal entities multiple trademarks related to websites used by Tucker to offer payday loans.  *See* Exhibit B at 14-16; *see also FTC v. AMG Services*, ECF No. 908-6 (Trademark assignment records).

46.     While Tucker wanted to create the appearance that the tribal entities had a substantive role in the operations, in reality, as Tucker knew, the tribes were no more than conduits for their unlawful payday lending businesses.

47.     In February 2016, tribal entities AMG Services, Inc. and MNE Services, Inc., which were corporations nominally established by the Miami Tribe of Oklahoma, entered into a Non-Prosecution Agreement with the U.S. Attorney's Office for the Southern District of New York, in which they admitted and affirmed this.  Specifically, the tribal entities admitted the following facts:

> 1.     In late 2003, representatives of The Miami Tribe of Oklahoma ("The Miami") learned that Scott Tucker owned and operated a business that made "payday loans." In or around November 2003, The Miami received a letter of intent from National Money Service, a company controlled by Tucker, contemplating a "Pay Day Loan Business Agreement" between The Miami and Universal Management Services, Inc. ("UMS"), a company also controlled by Tucker. Under the letter, a tribal entity would "become an authorized lender" and "earn substantial income," while "relying upon" National Money Service "to provide not only the capital to fund all loan transactions and all working capital requirements, but also the personnel, equipment, marketing and knowledge to make

9

the business an immediate success." The letter was followed by a written agreement between the Miami Tribe of Oklahoma Business Enterprises ("MTBE") and UMS. The agreement provided that MTBE would conduct business in the name "Tribal Financial Services" ("TFS"), and that MTBE would receive a monthly fee and cooperate with UMS "to do all things reasonable [sic] necessary to carry on the payday loan business as may be required by UMS." It was understood that this duty to cooperate included a duty of MTBE and TFS to invoke tribal sovereign immunity in response to any efforts by state governments to regulate or impose sanctions or prohibitions on such "payday loan business."

2.     Under the agreement, Tucker and entities controlled by Tucker, and not The Miami, provided the capital to make loans, and The Miami and its entities were not responsible for any losses. Neither The Miami, nor any entity that it controlled, established or paid to acquire any part of Tucker's payday lending business. Tucker and others based in Overland Park, Kansas, and not The Miami, managed operations and created the loan approval criteria. All essential steps necessary for the approval of loans were performed in Overland Park, under the direction of Tucker and individuals ultimately reporting to Tucker.

3.     Tucker, and others reporting to Tucker, using powers of attorney, opened or caused to be opened certain bank accounts in the names of entities controlled by The Miami. Neither The Miami nor any entity that it controlled exercised control over these accounts.

4.     In certain state court litigations, a then representative of The Miami who was then also an officer of entities controlled by The Miami that were involved in the loan business submitted factual declarations. These declarations were false, in part, because they overstated the involvement of such former representative and that of The Miami and/or entities controlled by the Miami in the operations of the loan business.

See https://www.justice.gov/usao-sdny/file/823666/download.

48.     While each of the tribes nominally held bank accounts at US Bank in the names of tribal-related entities, these accounts were in reality controlled by Tucker who used them to fund millions of dollars in personal expenses, including international trips, a private jet, and a professional auto racing team.  Tucker also used the funds nominally in the tribes' portfolio accounts to enrich Defendants.

49.     Through counsel, Tucker successfully secured the dismissal of multiple lawsuits by claiming that the tribes had substantive ownership and control of the lending entities and were thus protected by "tribal sovereign immunity," thereby enabling the illegal payday lending operations to continue for many years.

10

**Defendants' Activities with Tucker's Payday Lending Activities**

50.     Patten met Tucker while Patten worked for Selling Source, LLC and its subsidiaries, including PartnerWeekly L.L.C., and DataX, Ltd. (collectively "Selling Source"). Selling Source was embedded in the payday lending industry as a prominent lead generator, which attracted and found potential borrowers and then referred them – for a hefty fee – to lending entities who actually provided the usurious loans.

51.     Tucker's payday lending operations were Selling Source's largest client.  Indeed, Selling Source was formerly co-owned by Tucker, through Monitor Entity, Black Creek Capital. Tucker sold Selling Source to a private equity firm in December 2007.  Selling Source claimed that it desired "to help [people] live better physically, spiritually, financially, and emotionally," by providing a resource for short-term loans "quickly and easily."

52.     In reality, as Selling Source and Defendants knew or should have known, Selling Source was making millions of dollars by directing unsuspecting consumers to unlicensed lenders who offered interest rates well in excess of the legal limits in numerous states (sometimes in excess of 700%).  During Patten's tenure at Selling Source and afterwards, Selling Source and its subsidiaries understood the interest rates offered by the Tucker-related entities violated the usury laws of numerous states where consumer leads provided by Selling Source and related Defendants were provided to Tucker-related entities.

53.     Near the end of 2009, Tucker recruited Patten away from Selling Source to become a direct participant in Tucker's payday lending operations and other related entities.  To that end, in April 2009, Patten formed Pano Advisors, which performed work for Tucker's payday lending businesses out of Overland Park, Kansas.

54.     Tucker had hoped, among other things, that Patten's involvement would increase the volume of and profits from their loan portfolios, thus further extending the reach of their business preying upon innocent consumers through issuance of payday loans with exorbitant interest rates and hidden and misleading terms in the loan documents.

55.     To this end, Patten with a finance and accounting background, an MBA, and prior experience as a CFO, performed a variety of tasks, including managing and overseeing large

financial investments for Tucker personally, managing monthly financial reporting and projections for Tucker's businesses, delivering reports and commentary to Tucker, and performing other managerial and oversight tasks.

56.     Patten performed his work directly for Tucker.  He was paid variously through "consulting" payments, salary, and even as a percentage of the loan portfolios monthly revenues. On information and belief, Patten performed little to no work for anyone other than Tucker, and he did not report to anyone else.

57.     When Patten started working directly for Tucker, there were already numerous red flags that should have given Patten great pause.  Not only was Patten already familiar with the payday lending industry generally, but more specifically he knew about the practices of Tucker's payday lending businesses, including the exorbitant interest rates they charged consumers.

58.     Patten knew or should have known that the Tucker payday lending businesses, in which he was participating and from which he was financially benefiting, was causing direct harm to thousands of consumers.

59.     Patten knew or should have known that Tucker had previously been convicted of two federal felony charges of mail fraud and making a false statement to a bank as well as a felony charge in the State of Missouri for passing a bad check and as a result had served a year in Leavenworth federal penitentiary.

60.     Patten also knew or should have known that Tucker and his payday lending businesses had been hounded by consumer complaints and investigated by state regulators for many years for running an illegal payday lending operations that preyed upon vulnerable consumers by charging usurious interest rates.  For instance, in 2003, the States of Kansas, Colorado, and California sued Tucker and some of his payday lending operations for violation of anti-usury laws.

61.     From there, while working from the inside, Patten's knowledge of the Tucker payday lending enterprise only grew.  There was a deluge of additional revelations from 2009 on. Instead of investigating these red flags, Patten's work for Tucker – and payments from Tucker – grew exponentially.

62.     *First*, and perhaps most importantly, Patten knew or should have known about the FTC's complaint filed against Tucker and multiple related entities on April 2, 2012.  *See FTC v. AMG Services*, ECF No. 1 (Complaint).  The FTC's complaint alleged, *inter alia,* that Tucker was at the center of a massive common enterprise preying upon consumers through deceptive acts and practices and other violations of the law, such as offering consumers payday loans that misled consumers and resulted in consumers paying significantly more to satisfy the loans than what had been represented to consumers.  The FTC also alleged that Tucker centrally operated and controlled these businesses from Kansas with signatory authority on every corporate account of both Monitor Entities and tribal entities.

63.     During 2012, Patten fully understood Tucker's potentially massive exposure to the FTC lawsuit and was specifically informed that the FTC was alleging that Tucker had complete ownership of the payday lending operations and business and that he controlled the payday lending businesses associated with the tribes.  On information and belief, Patten was involved in discussions regarding the questionable relationship between the tribal entities and Tucker, including his use over many years of only verbal agreements with the tribes and the lack of supporting documentation regarding ownership and control of the tribal entities (*e.g.*, invoices, contracts, agreements, etc.).

64.     Accordingly, Defendants were well aware of the allegations that the FTC was raising against Tucker, the Monitor Entities, and the tribal entities, but continued to work with and profit handsomely from Tucker.  Instead, the majority of payments to Defendants (well in excess of $7 million) came *after* the filing of the FTC lawsuit.  Rather than distance himself from Tucker's business, Patten became more deeply enmeshed, even signing a contract indicating that he was the CFO of BA Services in December of 2012.

65.     Even if none of the prior red flags had raised alarm bells, which they should have, Patten's knowledge regarding the FTC lawsuit placed Defendants on notice to investigate and inquire whether the Tucker payday lending business was legal and whether they could continue to accept payments at Tucker's direction in good faith.

///

13

66.     *Second*, Patten knew or should have known about the increasing pressure multiple state regulators, in addition to numerous consumer complaints, that were continuing to apply not only to Tucker's payday lending business but also to Selling Source.

      a.    For example, since 2003, the Colorado Attorney General had been investigating Tucker's online payday lending companies, but had been stymied by the elaborate efforts to conceal Tucker's involvement in the enterprise and the invocation of "sovereign immunity."  In the Colorado litigation, by at least 2011 and 2012, the state regulators were publicly claiming that the tribal involvement was a sham as Tucker owned and operated these payday lending businesses.

      b.    In 2010, Pennsylvania's Department of Banking, Bureau of Compliance, Investigation, and Licensing asserted that Selling Source through its marketing and internet activities was violating consumer protection laws by engaging in unlicensed activity by assisting lenders such as the Tucker entities make illegal payday loans to Pennsylvania residents at astronomical interest rates well in excess of the State's 6% cap on interest rates. Ultimately, in 2011, Selling Source paid a penalty and entered into a consent decree, agreeing not to target Pennsylvania residents in its advertisements or otherwise make its products available to Pennsylvania residents. Additionally, the State of New York subsequently investigated Selling Source, MoneyMutual, LLC, and their use of Montel Williams for similar conduct between 2009 and 2013 via MoneyMutual.com and ultimately entered into a consent decree in 2015.

67.     *Third*, Defendants knew or should have known about the increasing media scrutiny that Tucker was receiving, particularly beginning in September 2011, when CBS News and the Center for Public Integrity published the results of an investigation regarding Tucker's payday lending business.  *See* http://www.publicintegrity.org/2011/09/26/6605/paydaylending-bankrolls-

auto-racers-fortune;       https://www.publicintegrity.org/2011/09/28/6656/race-car-driver-scott-tucker-drew-elaborate-facade-around-his-payday-loan-businesses.

68.     CBS and the Center for Public Integrity's September 26, 2011 article was entitled, "Race car driver Scott Tucker drew an elaborate facade around his payday loan businesses." *See* https://www.publicintegrity.org/2011/09/28/6656/race-car-driver-scott-tucker-drew-elaborate-facade-around-his-payday-loan-businesses.   This investigative report, among other things, exposed the "strange commingling of the interests of Tucker and the Indian Tribe" and claiming that "Tucker is living the life of luxury and spending a fortune on his racing hobby, while the tribes may only be getting a small piece of the revenue from the business. . . . [The investigation] found evidence in court and public records that Tucker still pulls the strings on the businesses he founded. . . . Most revealing of all, bank records show Tucker and his brother Blaine were the only two people able to sign for four payday lending businesses of one tribe." *See id.*

69.     *Fourth*, during 2013, Patten knew or should have known of Operation Choke Point, which was an effort by the federal government to crack down on certain industries, including payday lenders, including the Monitor Entities, by limiting these industries' access to payment processors, namely banks.  Patten learned that as a result of Operation Choke Point, Tucker's long-time bank, US Bank, refused to provide further services to Tucker and the Monitor Entities, and that thereafter numerous other banks also refused to provide services to Tucker and the Monitor Entities.  In January 2014, Patten sent an e-mail to family members attaching a recent article discussing Operation Choke Point.  By April 2014, Patten knew or should have known that BA Services was changing bank accounts with some frequency, and that at least one bank had terminated services to BA Services, and other Tucker entities, after just one month of service.  Furthermore, during this time period, Defendants were receiving checks from multiple different banks as a result of Operation Choke Point.

70.     This mountain of alarming information put Defendants on further notice to inquire whether Tucker, the Monitor Entities, and/or the tribal entities were engaging in a fraudulent enterprise and whether any funds or gifts received by Defendants at the direction of Tucker had been made or could be made in good faith.  Despite the continued presence of the mounting red

flags, Patten failed to conduct a sufficient inquiry into the bona fides of Tucker's payday lending enterprise and whether the large transfers being made to him had a fraudulent purpose or nature.

71.     Nor, on information and belief, did Defendants ever refuse to accept any payments based on concerns about the bona fides of Tucker or his operations.  To the contrary, Defendants became even more intertwined in Tucker's business.  In fact, on information and belief, in or about 2011 or early 2012, Patten directly negotiated for himself a "monthly incentive," based on a percentage of the total fees earned by the portfolio lending entities.  Specifically, Patten's company Pano Advisors received 1/2% of all fees generated by MNE Services, Inc., Red Cedar Services, Inc., and SFS, Inc. each month, regardless of any amount of purported "consulting services" the Defendants may have provided BA Services or Tucker during that time period.  This arrangement generated millions of dollars for Patten.  A table summarizing the payments to Pano Advisors and Patten is attached as Exhibit C hereto and incorporated by reference.

**Tucker's Transfers of Monitorship Estate Assets to Defendants**

72.     Between 2009 and 2016, Defendants received in excess of $10 million dollars in the form of transfers of the assets rightfully belonging to the Monitorship Estate.  These transfers were all made at the specific direction of Tucker.  These transfers took many forms, including salary payments, "consulting fees," and "monthly incentive" fees, and, at the direction of Tucker, were paid from Monitorship Estate assets whether from the accounts of tribal entities or Monitor Entities, over which Tucker had control.

73.     While some transfers were made initially through AMG Services, after Tucker formed BA Services in 2012, he began to direct most payments to Defendants through that entity, as detailed below.  *See generally* Exhibit C, which is incorporated by reference.

*Transfers of Assets via BA Services*

74.     The bulk of transfers made to Defendants were made from BA Services to Defendant Pano Advisors.  *See* Exhibit C.

75.     Tucker directed that these fraudulent transfers be made from his operations in Overland Park, Kansas to Defendants, from bank accounts he controlled.

///

76.     As examples, Defendants received checks and wire transfers from BA Services including:

a.     From April 2012 through August 2012, Defendant Pano Advisors received wire transfers from BA Services's Plains Capital bank account, totaling over $2.6 million.  *See id.*

b.     Between November 2012 and April 2014, Defendant Pano Advisors received checks and wire transfers from BA Services's Welch Bank account, totaling at least $5 million.  *See id.*

c.     In May of 2014, Defendant Pano Advisors received one check from BA Services's TD Ameritrade bank account for $210,000.

77.     Over $7 million was transferred *after* the FTC filed its complaint against the Tucker entities on April 2, 2012.

78.     Many of the checks issued from BA Services to Defendant Pano Advisors bear memo lines describing the payments as "consulting services" or "consulting fees."

79.     Each check issued by BA Services to Defendant Pano Advisors was endorsed by Defendant Patten.

80.     The amounts of many checks to Defendant Pano Advisors appear to be equal to a percentage of the total fees earned by MNE Services, Inc., Red Cedar Services, Inc. and SFS, Inc. during the month preceding issuance of the invoice.  In other words, Pano Advisors was paid 1/2% of all the total fees generated by MNE Services, Inc., Red Cedar Services, Inc. and SFS, Inc. each month, regardless of what supposed "consulting services" Pano Advisors may have provided BA Services during that time period.  This amount was paid, irrespective of the actual work done during the preceding month.

81.     Business records show that the total fees earned by MNE Services, Inc., Red Cedar Services, Inc. and SFS, Inc., collectively, are the same as the total fees earned by the following seven tribal entities: Ameriloan, 500 Fast Cash, One Click Cash, United Cash Loans, United Fast Cash, Advantage Cash Services, and Star Cash Processing.

///

*Transfers of Assets via Black Creek Capital*

82.     Defendant Pano Advisors received additional payments totaling over $750,000 from Black Creek Capital.  *See* Exhibit C.

*Transfers of Assets via AMG Services*

83.     Between 2010 and at least April 2012, Defendants received checks and wire transfers at the direction of Tucker from AMG Services, Inc., which Tucker controlled.   On information and belief, these payments totaled well in excess of $2 million.  *See id*.  This included the following payments:

a.     Tucker directed that Patten be paid a regular salary by AMG Services, Inc. More specifically, Patten, based on a Form W-2, reported income paid by AMG Services, Inc. of $441,891.72 in 2010.  For 2011, Patten also received at least $425,384 in salary from AMG Services, Inc., based on a December 2011 paystub.  *See* Exhibit C.

b.     On information and belief, Patten received in excess of $600,000 in 2012 and $1,000,000 in 2013 as "salary" from AMG Services, Inc.

c.     Between 2010 and early 2012, Tucker directed that Defendants be paid "consulting fees" by AMG Services, Inc.  Some of these were in the form of payments for "consulting fees," based on invoices from Defendants. Defendant Pano Advisors reported receiving $800,000 in payments from AMG Services, Inc. in 2011, based on its Form 1099.  *See* Exhibit C. Furthermore, Patten invoiced AMG Services, Inc. in December 2011 for $1,000,000 and thereafter made a deposit of that same amount into Pano Advisors' bank account on January 13, 2012.  *See id.*

*Additional Gift Transfers to Defendant Patten*

84.     In January 2013, Tucker used Monitorship Estate funds to wire a Texas-based Ferrari dealer to purchase a gift for Patten.  In April 2013, Patten received a Ferrari 458 Spider as a gift from Tucker, which was delivered to Defendant Patten in California and titled in Patten's name.  The value of such vehicles, when new, is upwards of $350,000.  Defendant Patten directly

sent the Ferrari dealership's wire instructions to Tucker, expressing his thanks and indicating "I really appreciate it[.]"   On the same day, Tucker responded that the wire "will go out this morning[.]"  Defendant Patten responded, "THANK YOU…Excited[.]"

*Additional Loan Transfer to Shared Resources*

85.     On information and belief, in or about 2014, Tucker also directed that a loan in excess of $100,000 be given to a new entity that Patten had formed called Shared Resources LLC. On information and belief, that loan was provided to Patten using the assets of Monitor Entities and remains due and owing.

86.     Defendants appear to have continued to work with Tucker through at least February 2016.

87.     On information and belief, Tucker and Patten appear at times to have made deliberate efforts to use their personal email accounts, and personal phones for text messages and calls, rather than using company email accounts to exchange written communications with each other.

88.     On information and belief, there were additional transfers of the assets, including money and gifts, of the Monitorship Estate made to Defendants at the direction of Tucker, which constituted fraudulent transfers and which rightfully belong to the Monitorship Estate.  The details of these transactions shall be learned through discovery in this case.  On information and belief, these payments were exorbitantly high and/or did not constitute reasonably equivalent value in exchange for the services rendered by Defendants.  Furthermore, Defendants knew or should have known at the time of the transfers the fraudulent purpose and nature of the transfers, and Defendants certainly would have discovered the fraudulent nature and purpose of the transfers if they had conducted even the most minimal or cursory inquiry into the matter.

**Other**

89.     Tucker's payday lending business was fraudulent during the entire time when Defendants received transfers.  All payments of the assets of the Monitorship Estate to Defendants were fraudulent payments based upon unauthorized and fraudulent payday loan activities.

///

90.     Additionally, on information and belief, the payments were exorbitantly high and did not constitute reasonably equivalent value in exchange for the services rendered.

91.     Furthermore, Patten and Pano Advisors knew or should have known at the time of the transfers that they could not take these payments in good faith for numerous reasons.  Notably, Defendants ignored the continued presence of red flags, which only grew in number while Patten himself grew closer to Tucker, ultimately occupying the office literally next door to Tucker.  Also, not only was there a mountain of publicly available information regarding Tucker and his control of the Monitor Entities and the tribal entities out of a central location in Overland Park, Kansas, but also Defendants gained intimate private knowledge, all of which confirmed the public accusations.  Moreover, Defendants knew or should have known at the time of the transfers the fraudulent purpose and nature of the transfers, and Defendants certainly would have discovered the fraudulent nature and purpose of the transfers if they had conducted even the most minimal or cursory inquiry into the matter.

## COUNT I

## FRAUDULENT TRANSFER

### (Against All Defendants)

92.     The Monitor repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

93.     The States of Kansas has adopted a version of the Uniform Fraudulent Transfers Act ("UFTA") that is substantively identical to the UFTA.  *See* K.S.A. § 33-201 *et seq*.

94.     Under the law of Kansas, and the UFTA, fraudulent transfers include those where the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.  *See* K.S.A. § 33-204(a)(1); *see also* 11 U.S.C. § 548(a).

95.     Based on the factual allegations above, Tucker directed that assets in the form of funds and gifts that rightfully belong to the Monitorship Estate be transferred to Defendants with the actual intent to hinder, delay, or defraud creditors.  These fraudulent transfers are voidable pursuant to the Kansas Uniform Fraudulent Transfer Act § 33-204(a)(1) and § 33-207(a)(1).

///

96.     Accordingly, the Monitor seeks to recover as fraudulent transfers all funds and gifts received by Defendants at the direction of Tucker that rightfully belong to the Monitorship Estate. The Monitor therefore requests that the Court order Defendants, jointly and severally, to pay to the Monitor all fraudulent transfers of funds they received, and to transfer to the Monitor all gifts received, as alleged herein and as further shown by proof at trial.

97.     The Monitor further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

**COUNT II**

**QUASI-CONTRACT CLAIM FOR RESTITUTION**

**BASED ON UNJUST ENRICHMENT**

**(Against All Defendants)**

98.     The Monitor repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

99.     Here, the transfers of funds and gifts that rightfully belong to the Monitorship Estate to Defendants constitute benefits conferred upon Defendants.

100.     These benefits were not conferred upon Defendants as the result of any explicit contract with Defendants.

101.     The Monitorship Estate did not receive equivalent value in return for the benefits conferred upon Defendants.

102.     Defendants have not returned these benefits to the Monitorship Estate, and have retained these benefits unjustly.

103.     Defendants' retention of the benefits from the Monitorship Estate comes at the cost of the victims of Tucker's payday lending business, whom would be entitled to the benefits as restitution.

104.     Under the circumstances alleged above, the funds and gifts constitute unjust enrichment and they must be returned to the Monitorship Estate.

105.     Because of Defendants' unjust enrichment, the Monitor seeks an equitable remedy ordering that Defendants are holding, and shall continue to hold, in constructive trust for the

Monitor the entire amount of the payments and gifts made to Defendants that rightfully belong to the Monitorship Estate.

106.     The Monitor is entitled to recover prejudgment interest from Defendants from the date of the receipt of each gift or payment.

### COUNT III

### REQUEST FOR ACCOUNTING BY DEFENDANTS

**(Against All Defendants)**

107.     The Monitor repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

108.     To ascertain the exact amounts of the assets of the Monitorship Estate received by Defendants at the direction of Tucker, including, but not limited to, all assets of BA Services, and to recover the amounts subsequently transferred by Defendants to others, the Monitor seeks entry of an order compelling Defendants to file with the Court and serve upon the Monitor an accounting, under oath, detailing the amounts received from Tucker, all accounts holding Monitorship Estate assets, including, but not limited to, BA Services, and all tribal entities, including, but not limited to, AMG Services; the current locations of the amounts, including the specific bank accounts where the distributions are held; the persons or entities with control over the accounts; and the location of any assets purchased or acquired with those moneys.

### JURY DEMAND

The Monitor demands a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, the Monitor respectfully prays for judgment against Defendants as follows:

1.     For the return of funds, or anything of value acquired with those funds, which were acquired by Defendants through fraudulent transfers and/or unjust enrichment of the Monitorship Estate's assets, including funds acquired as purported obligations supposedly owed to the Defendants by the Monitor Entities, tribal entities, and other Tucker-controlled entities;

2.  For imposition of a constructive trust in favor of Plaintiff as to all funds and gifts received by Defendants at the direction of Tucker from the Monitor Entities, tribal entities, and other Tucker-controlled entities;

3.  For a judgment ordering Defendants to file an accounting, under oath, as requested herein;

4.  For pre- and post- judgment interest;

5.  For attorneys' fees, and costs, to the extent permitted by law; and

6.  For such other and further relief as the Court may deem proper.

Dated:  November 29, 2017                    MCNAMARA SMITH LLP

                                            By:____/s/ Edward Chang_____
                                                Edward Chang
                                                Attorneys for Thomas W. McNamara,
                                                Court-Appointed Monitor

23